IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JANELL C. PARKS, | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT AND JURY DEMAND** |
| | ) | |
| CITY OF MADISON, a Political Subdivision, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW the Plaintiff, Janell C. Parks, by and through her attorneys, and for her causes of action against the Defendants hereby states the following:

**PARTIES-VENUE-JURISDICTION**

1. Plaintiff JANELL C. PARKS is a resident of Madison County, Nebraska.

2. Plaintiff, Janell C. Parks (hereinafter "Parks"), at all relevant times alleged herein, was a resident of Madison, Nebraska, and a former employee of Defendant City of Madison ("Defendant" or "Madison"). During her employment with Defendant, Parks was also referred to by her maidan name, Janell Parks.

3. At all relevant times, Madison has continuously been a political subdivision doing business in the State of Nebraska and in the City of Madison, Nebraska.

4. This Court has original jurisdiction over the claims arising under Federal law and concurrent jurisdiction over the state law claims. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1331 and the Court's pendent claim jurisdiction under 28 U.S.C. §1367(a).

5. Venue is appropriate in this District under 28 U.S.C. §§1391(b) and (c).

6. On or about February 4, 2025, less than 90 days prior to the filing of this Complaint, Plaintiff received the Nebraska Equal Opportunity Commission's determination with respect to

1

Plaintiff's charges, NEB 1-22/23-2-53280-RS.

7. On or about March 3, 2025, less than 90 days prior to the filing of this Complaint, Plaintiff received a Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission on charge number 32E-2023-00252.

## FACTUAL BACKGROUND

8. Parks commenced employment with Defendant in May 2018. Parks most recently worked for Madison cleaning and in the youth recreation department.

9. Parks is a Hispanic female.

10. On or about March 24, 2022, Parks drove to Pilger recycling center with Hugo Sandoval, (hereinafter "Sandoval") a utility employee. During the course of the ride, Sandoval apologized for the way he said he had to treat Parks. James Lewis (hereinafter Lewis), Defendant's Utilities Superintendent, instructed him to not help Parks out, and to make things more difficult for her.

11. Sandoval also told Parks that Lewis could not stand that she was a Hispanic woman and doing great things in the community. He told Parks that the plan was when Rob Fite (hereinafter "Fite") became mayor, Lewis and Fite plan on "clipping your wings and putting you in a cage." Sandoval further elaborated that Fite planned on firing Parks because Lewis does not want her there and he goes out of his way to make Parks' job harder for her.

12. Sandoval also told Parks about how most of the time when they are working, they are not even working on city business. Sandoval said he spent most of his time working on personal favors that Lewis has lined up for them that have nothing to do with the city. Over this period of time, Parks would often see the utility guys working in different areas that were not city projects.

13. On June 22, 2022, Lewis came to the city office to scream in Parks' face, calling

her "a stupid Mexican" and telling her not to talk to his employees. After this happened, Parks asked the office manager, Lori Pfiefer (hereinafter "Pfiefer") how this behavior was ok and how she was able to allow this to happen under her watch. Pfiefer asked how Parks deals with being treated that way. Parks told her she had no choice but to work for her family, and it was not the first time something like this had happened; it was just one of the more aggressive times. The incident was also verbally reported to Mayor Alvin Brandl by Parks.

14. Throughout her employment, Parks requested to serve on the City Parks Board, and Madison's City Attorney, Mike Brogan (hereinafter "Brogan") would not allow her to serve on the Parks Board while being employed by Madison.

15. Brogan did allow Madison Utilities employee, Larry Bromm; Madison Pool manager, Rachel Harrimann; and Madison Concession Stand Worker/ Recreation Coordinator, Nico Gronenthal; to serve on the Madison Parks Board while being employed by Madison.

16. Throughout her employment, Lewis harassed Parks by making comments like "fucking Mexicans" or "fucking gooks."  Lewis has made statements like these in front of other supervisors, including but not limited to Office Manager/Treasurer Lori Pfeifer.

17. Parks repeatedly complained about Lewis' harassing behavior to Pfeifer, Councilman Brian Zessin, Councilman Paul Kellan, and Mayor Brandl.

18. On or about October 2022, Parks began reporting illegal activity by Lewis and his subordinates in the Utilities Department in that Lewis has used Madison's shop to build his private home, while using the time and labor of Madison employees. She made reports to Lori Pfeifer, Kelli Dickies, Lori Kellen, Councilman Paul Kellen, Councilman Brian Zessin, and Mayor Brandal.

19. Because Pfeifer always expressed doubt when Parks would report Lewis' illegal

activities, Parks began taking photos to prove to Pfiefer she was telling the truth. After Parks began providing Pfeifer with photos, Pfeifer began telling Lewis that Parks was taking pictures of them working at his house when she would see them there during city time.

20. Following Pfiefer's reports, Lewis increased his poor treatment of Parks and went out his way to upset her with every chance he could. He would deny any requests she had for assistance to do her job, he would scream at her when she called him, he would following her around town or block her into parking spaces during working hours and drive past her home slowing and stare at her during non-working hours.

21. The Madison City Council started to investigate the information that had been provided to them about Lewis and the illegal activity. Many people were aware that Parks had provided most of the pictures. Pfiefer told Parks that she would go down for that and would ask Parks what she was going to do when they did nothing about this.

22. In retaliation for Parks' complaints, she was further harassed by being made to track her workday activities in detail. Other Madison employees, specifically utilities department employees, were not required to account for their work time in the same detail.

23. In December 2022, Parks further complained about illegal activity when she reported to a Health Department staff member, the Mayor Rob Fite, Police Chief Matt Garthner and City Physician Twyla Hoffer that she, and others were being exposed to mold in the city office building. Despite Parks' complaint, the mold was never mitigated.

24. During December 2022, Parks was working on a multicultural outreach project for which Madison had received funding from the Nebraska Recycling Council to implement. Lewis was upset that Parks was working on this project, making racist, hostile comments that "the fucking Mexicans, fucking gooks don't need to know how to recycle."

25. In advance of the December 12, 2022, Council Meeting, Parks was asked by Mayor Brandl to write a letter to the Madison City Council stating the behaviors and actions of Lewis. Parks told Brandl she feared retaliation because of the way she had already been treated. Parks told Brandl that she would prefer to give a statement in person at the council meeting. Parks discussed the close familial relationship between Lewis and Fite; the racial slander that Lewis subjected her to, the threatening and intimidating actions, verbal harassment, screaming very close to her face; and pointing his finger in Parks' face. Lewis' harassing behavior happened often prior to him finding out that Parks had reported his illegal activity and escalated when he became aware that Parks had reported him and provided photos. Mayor Brandl agreed and told Parks to be present at the council meeting on December 12, to address the council in person.

26. During the December 12, 2022, City Council meeting, Parks attempted to address the Madison City Council about her previous allegations, but her motion to speak was denied.

27. On or about January 3, 2023, newly elected Mayor Fite had a discussion with Parks and began removing responsibilities from her position and instructed her that she was to report to the Madison Parks Board, a group of volunteers, rather than the office manager as she had always done before.

28. Around January 2023 Mayor Fite instructed Parks to send him all of her timecards. Parks was the only employee instructed to provide timecards to Mayor Fite.

29. On or about February 17, 2023, Parks participated in a meeting with the Board of Health to make a decision about future work in the city office building due to the mold found there. As Parks was quite ill by this point, she asked what to do if the employees were all sick. The Board of Health stated anyone sick should go to the doctor and get a baseline of their symptoms. Parks requested that Pfeifer file a workman's compensation claim for her, and Pfeifer refused to do so.

Thereafter, Parks filed a workers compensation claim herself, directly to Defendant's insurance company.

30. During February 2023, Mayor Fite continued to remove job responsibilities from Parks without telling her. When tasks were not completed, Mayor Fite would give them back to Parks without giving her a realistic timeline to complete the work.

31. On February 28, 2023, Parks was working in the city office, assisting with office coverage due to other employees being gone. Lewis stopped into the office, screamed at Parks and was very mad Parks was covering for co-workers in the office.

32. During March 2023, Parks missed work repeatedly for workers' compensation medical treatment and had to use sick time for those appointments.

33. On March 30, 2023, Parks overhead Lori Kellen leaving for a workers' compensation related doctor's appointment. Pfiefer told Kellen to stay clocked in and to get paid while attending her doctor's appointment.

34. On the morning of May 12, 2023, a draft of the Nebraska State Auditor's report related to Lewis' illegal activities that Parks had complained about was emailed to Defendant.

35. Later that same day, Pfeifer disciplined Parks for misusing a city vehicle. Parks denied wrongdoing and asked who made the false report about her. Pfeifer refused to tell Parks who made the false report.

36. After the Nebraska State Auditor's about Lewis's unlawful activities was published, Lewis refused work with Parks. Lewis would either refuse to speak with Parks or when he did speak with her, he would scream at her.

37. At least once during the Summer of 2023, Lewis got into Parks' face screaming at her that Mayor Fite would get her back for "all of this."

38.     During the summer of 2023, as he would walk away or past Parks, he would call her a "nigger lover" under his breath because she is married to a Black man.

39.     Throughout the summer of 2023, Parks would report Lewis' treatment of her to Teresa Hall, Kellan and Brian and Rob. Parks was not aware of any action taken by Defendant to end Lewis' harassment of her, and if there was action taken, Lewis' harassment did not stop.

40.     Throughout the summer of 2023, Parks was treating for her workers' compensation injury, she was still being required to use sick leave for her doctor's appointments and track all of her work for review while others were not subject to the same working conditions.

41.     On August 3, 2023, Parks submitted a resignation letter due to Lewis' escalating behavior and no action by Defendant to end the harassment. Parks requested an exit interview and a copy of her employee file from Defendant. Mayor Fite refused both requests, stating that he was advised by legal counsel not to speak to Parks.

42.     Prior to her constructive discharge, Plaintiff's job performance was satisfactory.

43.     At the time of her termination, Plaintiff was earning approximately $20.25 per year plus benefits working full time hours for Defendant. As part of her compensation, Plaintiff also was eligible to receive health, dental, and vision insurance, retirement benefits, short term and long-term disability, accidental death and life insurance benefits in amount that is currently unknown to Plaintiff and will be subject to further discovery. As of the date of this filing, Plaintiff's lost wages resulting from Defendant's wrongful conduct are in excess of $5,000 and are continuing.

44.     As a result of Defendant's wrongful conduct, Plaintiff suffered lost wages, compensatory damages, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and has also incurred attorney's fees and other costs that are continuing.

## COUNTS I & II

### SEX DISCRIMINATION

**42 U.S.C. § 2000e-2 and Neb. Rev. Stat. §48-1004**

45. Plaintiff hereby incorporates paragraphs 1 through 44 as if fully set forth herein and states:

46. Defendant discriminated against Plaintiff with respect to terms and conditions of her employment on the basis of her sex in violation of Title VII and the NEFEPA by treating her differently than similarly situated male co-workers.

47. Plaintiff suffered adverse action including but not limited to harassment, discipline, increased job responsibilities, increased scrutiny of her performance and constructive discharge.

48. Plaintiff's sex was a motivating factor in the decision-making regarding Plaintiff's terms and conditions of employment.

49. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, future earnings, and other emoluments of employment.

## COUNTS III & IV

### NATIONAL ORIGIN DISCRIMINATION

**42 U.S.C. §§2000(e) et seq. and Neb. Rev. Stat. §48-1004**

50. Plaintiff hereby incorporates paragraphs 1 through 49 as if fully set forth herein and states:

51. Defendant discriminated against Plaintiff with respect to terms and conditions of her employment on the basis of national origin in violation of the Title VII and the NEFEPA by treating her differently than similarly-situated non-Hispanic employees.

52. Plaintiff suffered adverse action, including but not limited to harassment, discipline, increased job responsibilities, increased scrutiny of her performance and constructive discharge.

53. Plaintiff's national origin was a motivating factor in the decision-making regarding Plaintiff's terms and conditions of employment.

54. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, future earnings, and other emoluments of employment.

## COUNT V
## RACE DISCRIMINATION
## 42 U.S.C. § 1981 and §1983

55. Plaintiff hereby incorporates by reference paragraphs 1 through 54 and states:

56. Defendant discriminated against Plaintiff on the basis of her race in violation of 42 U.S.C. § 1981 by subjecting her to a racially hostile treatment, including racial slurs, threats, and exclusion, while at work. Said conduct was severe or pervasive enough to alter the conditions of Plaintiff's employment. Said conduct was based on Plaintiff's race.

57. Defendant discriminated against Plaintiff on the basis of her race in violation of 42 U.S.C. § 1981 by subjecting her to disparate treatment in the terms, privileges, and conditions of her employment. Plaintiff suffered adverse action, including but not limited to not limited to harassment, discipline, increased job responsibilities, increased scrutiny of her performance and

constructive discharge. Plaintiff's race was a motivating factor in the decision-making regarding Plaintiff's terms and conditions of employment.

58. Defendant's conduct violated Plaintiff's rights under §1981, and this action is brought pursuant to §1983.

59. The racial discrimination and hostile work environment Plaintiff endured were carried out pursuant to an official policy, custom, or practice of the Defendant, or resulted from the deliberate indifference of officials with final policymaking authority.

60. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, future earnings, and other emoluments of employment.

## COUNTS VI AND VII

### RETALIATION

**42 U.S.C. § 2000(e) et seq, 42 U.S.C §1981, 42 U.S.C §1983 and Neb. Rev. Stat. §48-1114**

61. Plaintiff hereby incorporates paragraphs 1 through 60 as if fully set forth herein and states:

62. During her employment, Plaintiff engaged in protected activity, including but not limited to exercising her rights by complaining of sex discrimination and race discrimination.

63. Defendants took adverse employment action against Plaintiff, including but not limited to subjecting her to harassment, discipline, unfavorable work assignments, subjecting her job performance to higher scrutiny than others and constructive discharge.

64. There is a causal connection between Plaintiff's participation in protected activity and Defendant's adverse action against her.

65. As a result of Defendant's retaliation, Plaintiff has in the past and will in the future suffer injuries and damages, including, but not limited to mental and emotional distress; humiliation; fear, embarrassment; lost enjoyment of life; lost wages and benefits; front pay and other emoluments of employment.

## COUNT VIII

## WHISTLEBLOWER RETALIATION

### Neb. Rev. Stat. §48-1114

66. Plaintiff hereby incorporates paragraphs 1 through 65 as if fully set forth herein and states:

67. Defendant was at all times material an "employer" within the meaning of Neb. Rev. Stat. §48-1102.

68. During her employment, Plaintiff engaged in protected activity, including but not limited to reporting and opposing illegal activity, criminal conduct, and violations of state law.

69. Defendant took adverse employment action against Plaintiff, including but not limited to subjecting her to harassment, discipline, unfavorable work assignments, subjecting her job performance to higher scrutiny than others and constructive discharge.

70. There is a causal connection between Plaintiff's participation in protected whistleblower activity and Defendant's adverse action against her.

71. As a result of Defendant's retaliation, Plaintiff has in the past and will in the future suffer injuries and damages, including, but not limited to mental and emotional distress; humiliation; fear, embarrassment; lost enjoyment of life; lost wages and benefits; front pay and attorney's fees.

## COUNT IX

## WRONGFUL TERMINATION IN VIOLATION

## OF NEBRASKA PUBLIC POLICY

72. Plaintiff hereby incorporates paragraphs 1 through 71 as if fully set forth herein and states:

73. Defendant was at all times material an "employer" within the meaning of Nebraska common law.

74. During her employment, Plaintiff engaged in protected activity, including but not limited to reporting and opposing illegal activity, criminal conduct, and violations of state law.

75. During her employment, Plaintiff engaged in protected activity, including but not limited to reporting her workers' compensation injury and claiming benefits.

76. Defendant took adverse employment action against Plaintiff, including but not limited to subjecting her to harassment, discipline, unfavorable work assignments, subjecting her job performance to higher scrutiny than others and constructive discharge.

77. There is a causal connection between Plaintiff's participation in protected activity and Defendant's adverse action against her.

78. As a result of Defendant's wrongful conduct, Plaintiff has in the past and will in the future suffer injuries and damages, including, but not limited to mental and emotional distress; humiliation; fear, embarrassment; lost enjoyment of life; lost wages and benefits; front pay and attorney's fees.

## DAMAGES

79. Plaintiff hereby incorporates by reference paragraphs 1 through 78 and states:

80. As a result of Defendant's discrimination, retaliation and other wrongful conduct,

Plaintiff has suffered damages and seeks the following relief:

a. Back pay and lost benefits to the time of trial;

b. Front pay including retirement and other benefits;

c. Federal and state income tax gross up to offset increased tax liability for lost wage award;

d. Compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

e. Attorney's fees, expert witness fees and other reasonable costs; and,

f. Pre-judgment and post judgment interest.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for all her general, special, and punitive damages, for costs, attorney's fees, interest and for such other relief as just and equitable.

Plaintiff demands a trial by jury.

Dated: May 5, 2025.

JANELL C. PARKS, Plaintiff

BY: s/ Jennifer Turco Meyer
Jennifer Turco Meyer, 23760
Turco Meyer Law, LLC
4309 South 174th Avenue
Omaha, Nebraska 68135
(402) 577-0252
jennifer@turcomeyer.law
Attorney for Plaintiff